UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NINA ALEXANDER, ET AL | CIVIL ACTION |
| VERSUS | NO. 06-5405 |
| CITY OF GRETNA, ET AL | SECTION "S" (2) |

## ORDER AND REASONS

The Motion for Partial Summary Judgment (Doc. #43) by the City of Gretna, Gretna Police Department and Chief Arthur Lawson is **GRANTED**, and plaintiffs' right to travel claims are **DISMISSED**.

## BACKGROUND

On August 29, 2006, plaintiffs, Nina Alexander, Jocelyn Askew, Quinton Askew, Frances B. Bowie, Signora Durette, and Patryce Jenkins, filed a class-action complaint against defendants, the City of Gretna Police Department through the City of Gretna; Arthur Lawson, Chief of Police for the City of Gretna Police Department; Jefferson Parish Sheriff's Office; Sheriff Harry Lee (now substituted by Sheriff Newell Normand); and unknown officers and deputies of the City of Gretna Police Department.[1]

Plaintiffs allege that in the days immediately following Hurricane Katrina, defendants

---

[1] Plaintiffs' motion for class certification is pending. The court has authority to dismiss claims on the merits before addressing the class-certification issue. *Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir. 1987); *Federal Practice and Procedure*, §1785, at 128 (1986).

violated their constitutional rights pursuant to 42 U.S.C. §1983, by wrongfully blocking plaintiffs' attempt to evacuate New Orleans by crossing the Crescent City Connection ("CCC") on foot. The CCC, which plaintiffs allege is a federal roadway under the jurisdiction of the Federal Highway Administration, consists of two multi-lane, vehicles-only, tolled spans which cross the Mississippi River, connecting the east and west banks of the City of New Orleans. Plaintiffs' complaint alleges that defendants' actions violated their right to travel on interstate highways under Article I, Section 8,[2] and their right to travel freely under Article IV, Section 2.[3] However, in the submissions in opposition to this motion, plaintiffs argue that defendants' refusal to allow them to cross the CCC on foot violated their substantive due process and equal protection guarantees.[4]

Defendants have moved for partial summary judgment, seeking dismissal of plaintiffs' right to travel claims. Defendants argue that plaintiffs had no right to cross the bridge in the manner and at the time that they tried to do so, and that defendants were acting within the scope of their authority in refusing plaintiffs' passage on foot across the CCC.

---

[2] Article I, §8 of the United States Constitution enumerates the powers of Congress, and has been recognized to include the power of Congress to legislate to protect individuals' free movement within interstate commerce. *U.S. v. Guest*, 383 U.S. 745, 759 (1966).

[3] Article IV, §2, Cl. 2 of the United States Constitution states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

[4] Plaintiffs also claim that under 42 U.S.C. §1983, defendants violated their (1) First Amendment rights of peaceful assembly; (2) Fourteenth Amendment and Fifth Amendment Due Process rights; (3) Fourteenth Amendment Equal Protection rights; (4) Fourth Amendment rights of freedom from unreasonable searches and seizures; and (5) Eighth Amendment rights prohibiting cruel and unusual punishment.

Plaintiffs do not contest the constitutionality of state statutes which specifically prohibit pedestrian traffic on the CCC. *See e.g.*, La. Admin. Code Title 70, Part XXV, §115 C(5) which specifically prohibits pedestrians on the CCC.

## ANALYSIS

### A. Summary Judgment

#### 1. Legal Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."[5] If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.[6]

Although the court must consider the evidence with all reasonable inferences in the light most favorable to the non-moving party, the non-movant must produce specific facts to demonstrate that a genuine issue exists for trial.[7] The non-movant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue.[8] The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient to defeat a properly supported motion for summary judgment.[9] Accordingly, conclusional rebuttals of the pleadings are insufficient to avoid summary judgment.[10]

---

[5] *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. Proc. 56(c).

[6] *Celeotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).

[7] *Webb v. Cardiothoracic Surgery Associates of North Texas*, 139 F.3d 532, 536 (5th Cir.1998).

[8] *Id.*

[9] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).

[10] *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir.1993).

**B. Substantive Due Process**

The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them,'"[11] and protects against government conduct that is arbitrary, capricious, and wholly unrelated to a legitimate state purpose.[12]

To state a cause of action under a federal civil rights statute for violation of the due process clause, plaintiff must show that he has asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment and that he was intentionally or recklessly deprived of that interest, even temporarily, under color of state law.[13] The protections of the Due Process Clause extend to fundamental rights.[14]

Analyzing a case under substantive due process, a court will apply one of two levels of scrutiny. If the challenged action infringes upon a fundamental right, a court applies strict scrutiny,[15] which requires the government to show a compelling reason for the action.[16] If the challenged action infringes some other non-fundamental liberty interest, a court applies rational basis review,[17] which requires the government to demonstrate that the action was related to a legitimate government

---

[11] *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 450 (5th Cir. 1994)(citation omitted).

[12] *Doe*, 15 F.3d at 459.

[13] *Doe,* 15 F.3d at 450.

[14] *Doe,* 15 F.3d at 450.

[15] See *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). See also *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505-06 (5th Cir. 2006).

[16] *Woods v. Holy Cross Hospital,* 591 F.2d 1164, 1776 (5th Cir. 1979).

[17] See *Meyer v. Nebraska*, 262 U.S. 390, 399-40 (1923).

purpose.[18]

Plaintiffs' claimed liberty interest is their fundamental right to travel. They assert that their substantive due process rights were violated when law enforcement officers did not allow them to cross the CCC on foot.

**1. *Right to Intrastate Travel***

In the companion case of *Dickerson v. City of Gretna*, No. 05-6667, 2007 WL 1098787 (E.D. La. Mar. 30, 2007), plaintiffs alleged that their substantive due process rights to *intrastate* travel were violated when defendants "wrongfully refused" to allow plaintiffs to evacuate Orleans Parish through the City of Gretna by way of the Westbank Expressway by crossing the CCC on foot.[19] In ruling on defendants' motion to dismiss, this court analyzed the issue whether there was a constitutional right to *intrastate* travel, and noted Fifth Circuit precedent which held that *intrastate* travel was not a fundamental right protected by the Constitution.[20]

As stated in *Dickerson*, while there is no doubt that a fundamental right of *interstate* travel exists, the Supreme Court has not ruled on whether a right of *intrastate* travel exits. This court declined to hold that there is a fundamental right to *intrastate* travel. This court is bound by Fifth Circuit, which has held that *intrastate* travel is not a fundamental right protected by the Constitution.[21] To the extent that plaintiffs' claim alleges a violation of a constitutional *intrastate* right to travel, the court **GRANTS** defendants' motion for partial summary judgment.

---

[18]*Woods,* 591 F.2d at 1776.

[19]*Dickerson,* 05-6667 (E.D. La. Mar. 30, 2007)(Docs. ## 1 and 23).

[20]*Dickerson,* 05-6667 (E.D. La. Mar. 30, 2007)(Doc. # 32). *See also Wright v. City of Jackson*, 506 F.2d 900 (5th Cir. 1975).

[21]*See Wright,* 506 F.2d 900.

## 2. *Right to Interstate Travel*

Although the word "travel" is not found in the text of the Constitution, the Supreme Court has found repeatedly that a "'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence."[22] Further, the right of interstate travel has been deemed a fundamental right.[23]

However, not every state law affecting interstate travel implicates the denial of a fundamental right. As the Fifth Circuit noted, "[i]f every infringement on interstate travel violated the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue."[24] Consequently, "[t]ravelers do not have a constitutional right to the most convenient form of travel,"[25] and minor restrictions on travel do not amount to denial of the fundamental right to interstate travel.[26]

---

[22]*Saenz v. Roe*, 526 U.S. 489, 498 (1999) *(quoting Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled in part on other grounds, Edelman v. Jordan*, 415 U.S. 651 (1974)). "Without noting the specific constitutional source of the right to travel, the Court has long 'recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.'" *Saenz*, 526 U.S. at 498 *(quoting Shapiro,* 394 U.S. at 629). *See also City of Houston v. F.A.A.,* 679 F.2d 1184, 1198 (5th Cir. 1982)("While one could search forever for a clause explicitly conferring such a right and never discover one, the Supreme Court, in *Shapiro* . . . did find such a guarantee.") and *Lutz v. City of York, Pa.*, 899 F.2d 255, 260-62 (3rd Cir. 1990)(for concise explanation of possible constitutional sources for right to travel).

[23]*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 n. 3 (1976). *See also Sonnier v. Quarterman*, 4756 F.3d 349, 368 n. 16 (5th Cir.), *cert. denied*, 128 S.Ct. 374 (2007). The Court has noted three different components to the right to travel - the right of a citizen of one State to enter and leave another State; the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State; and, for those travelers who elect to become permanent residents, the right to be treated like other citizen of that State. *Saenz*, 526 U.S. at 500.

[24]*Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991), *cert. denied*, 502 U.S. 907 (1991)(*citing City of Houston v. F.A.A.*, 679 F.2d 1184, 1198 (5th Cir. 1982) and *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986)).

[25]*City of Houston,* 679 F.2d at 1198. *See also Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999)(stating that "burdens on a single mode of transportation do not implicate the right to interstate travel").

[26]*Cramer*, 931 F.2d at 1031 (citations omitted). In *Cramer*, the Fifth Circuit concluded that a state law prohibiting airlines from selling transportation out of the Love Field airport to points outside the State of Texas did not

Further, the right to interstate travel "does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area ..."[27]

Plaintiffs allege that their fundamental right to interstate travel was violated when, in the days after Hurricane Katrina, law enforcement officers refused to allow plaintiffs to cross the CCC on foot. Plaintiffs further argue that defendants' conduct in blockading the CCC "confined out-of-state residents in New Orleans, unconstitutionally depriving those out-of-state residents and others similarly situated" of their right of movement. Plaintiffs argue that the CCC was "one of a very few, if not the only, means of egress from low-lying New Orleans in the aftermath of Hurricane Katrina."[28] Plaintiffs concede that the storm created a "state of emergency in the New Orleans area."[29]

Plaintiff, Nina Alexander, a New Orleans resident, testified by deposition that on August 29, 2005, when Hurricane Katrina passed over New Orleans, she was with her boyfriend and his co-workers at the administrative building of the Regional Transit Authority ("RTA") on the east bank

---

implicate plaintiff's fundamental right to interstate travel because plaintiff was free to travel to points outside the Love Field airport area by using another nearby airport. *Cramer*, 931 F.2d at 1031.

[27]*Zemel v. Rusk*, 381 U.S. 1, 15-16 (1965).

[28]Plaintiffs do not provide the court with evidence that the CCC provided the only means of egress out of New Orleans after Hurricane Katrina.

[29]There are no allegations of racial bias in plaintiffs' complaint. Plaintiffs argue in the submission in opposition to this motion that defendants engaged in "a ruse to hide a more insidious plot which was primarily to keep African - Americans from New Orleans from coming into Gretna and Jefferson Parish." *See* Doc. #46 at 9. However, plaintiffs make no such claim in their Complaint, and have not alleged any facts that defendants' actions were racially motivated. Whether a complaint gives reasonable notice of a claim is a "pure question of law." *Bejil v. Ethicon, Inc.*, 269 F.3d 477 (5th Cir. 2001)(affirming the dismissal of additional claims under Fair Labor Standards Act not plead in plaintiff's complaint). *See also Kirkpatrick v. Seligman & Latz, Inc.*, 636 F.2d 1047, 1050 (5th Cir. 1981). Plaintiffs' complaint is silent as to improper racial motivation. Any such allegations are not before the court in this case.

of New Orleans. The building and the surrounding streets flooded after the storm. On the Tuesday after the storm, Alexander, her boyfriend and his co-workers waded through chest deep water to Canal Street, to an unflooded area, and eventually to the CCC where officers of the CCC and of the City of Gretna refused to allow them to cross the CCC on foot. Her boyfriend explained to the officers that they were trying to get to the west bank of the river where buses were waiting to pick them up. Alexander understood that her boyfriend's boss was on the telephone with the governor's office trying to negotiate arrangements to have buses come to the east bank to pick up the group. About an hour later, three buses picked up Alexander and her group on the east bank, and transported them to the west bank to a bus stop under the elevated expressway in Gretna. Alexander and her group waited for another hour before charter buses arrived and brought them to an RTA bus terminal. Around sunset, more charter buses arrived and brought Alexander and her group to Baton Rouge.[30]

    Plaintiff, Cathey Golden, a resident of Boston, testified that when the storm struck, she and her family were guests at the Hotel Monteleone in New Orleans. Before the storm, she and her family tried to leave New Orleans, but the airport had shut down. They remained at the hotel for three days when the hotel ran out of food. Golden and her group left the hotel, walked up the Tchoupitoulas Street ramp which led to an elevated portion of the expressway leading to the CCC, hoping that they could walk across the bridge on foot and in a better position to get to Texas or away from New Orleans. Golden had heard that buses would be available on the elevated expressway. As Golden and her group were walking up the ramp, cars on their way to the west bank were passing her and her group. Other Monteleone guests and "miles and miles of people" were also attempting

---

[30]*See* defendant's memorandum in support, Ex. 1, Deposition of Nina Alexander (Doc. #43).

to go up the ramp. As she neared the CCC, she encountered officers who told her that no foot traffic was allowed on the bridge. She remained on the expressway for "a couple of hours," and noticed vehicular traffic going both ways across the CCC. Eventually, an officer told Golden and her group to leave the expressway. Golden and her family walked down another ramp. She and her family used an empty school bus for shelter on Thursday night. They were joined by two paramedics, one of whom was Larry Bradshaw, a member of a search and rescue unit of the San Francisco Fire Department. On Friday, through the help of Bradshaw's supervisor in connection with the local fire department on the west bank, Golden and her family walked across the bridge on foot with Bradshaw. While crossing, she noted heavy vehicular traffic traveling in both directions on the bridge. When they reached the west bank, she and her family walked with Bradshaw to a filling station reserved for law enforcement personnel. An hour later, she and her family boarded a small van which took them to another place on the west bank. A helicopter then flew them to the Saints football training camp, and from there they were transported by truck to the airport where a military transport plane flew her to Texas and eventually back to Boston.[31]

      Larry Bradshaw testified that on the day after the storm, he was in a group of seven who had approached the CCC by walking up the St. Charles ramp of Interstate 10 West. When Bradshaw was stopped by two officers, he explained that he was a member of the San Francisco Fire Department; that he and his group wanted to walk across the bridge to shelter in a fire department across the river; and that this was arranged through the FEMA command post. Bradshaw said that he showed one officer his badge, but that the officer remained reluctant to allow him to continue across the bridge. The officer told him that if Bradshaw's superior would contact the officer's superior, he would allow

---

[31] *See* defendant's memorandum in support, Ex. 2, Deposition of Cathey Golden (Doc. #43).

9

Bradshaw and his group to cross. Bradshaw then called his superior, Chief Ferroni, on his cell phone, and gave the phone to the officer. After the officer spoke to Ferroni, the officer radioed his supervisor. After 20 to 40 minutes, the officer told Bradshaw that FEMA had confirmed that Bradshaw and his group could cross.[32]

Chief Arthur Lawson testified that foot traffic was prohibited on the CCC because of the safety hazard caused by having pedestrians on the bridge. In the days after Katrina, there were emergency vehicles "flying back and forth." Lawson said that at the time the best means of eventually getting supplies and transportation was to remain in New Orleans because relief would eventually come there. Further, Lawson stated that the City of Gretna had no food, water, supplies or shelters to offer the evacuees.[33]

Plaintiffs allege defendants' conduct violated their fundamental right to interstate travel. Strict scrutiny applies to government actions which affect fundamental rights.[34] Under the strict scrutiny standard, government actions may be justified only if narrowly tailored to accomplish a compelling state interest.[35]

Defendants have demonstrated compelling safety and welfare reasons for refusing to allow plaintiffs to cross on foot the CCC. It is undisputed that Hurricane Katrina caused a monumental crisis in the entire New Orleans area; that the aftermath of the storm led to widespread flooding and social unrest in the area; that the CCC was never open to foot traffic; that at the same time plaintiffs

---

[32] *See* plaintiffs' opposition, Ex. A, Deposition of Larry Bradshaw (Doc. #46).

[33] *See* defendant's reply to plaintiffs' opposition, Exs. 1 and 2, Deposition of Arthur Lawson (Doc. #51).

[34] *See Reno v. Flores*, 507 U.S. 292, 301-02 (1993). *See also Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505-06 (5th Cir. 2006).

[35] *Woods v. Holy Cross Hospital,* 591 F.2d 1164, 1176 (5th Cir. 1979). *See also Reno,* 507 U.S. at 301-02.

were attempting to walk across the CCC on foot, there was heavy vehicular traffic, including emergency vehicles, on the CCC to and from the east and west banks of the city; that there were hundreds of people without food or water attempting to cross the bridge; and that the City of Gretna had no food, water or shelter available for evacuees. It is also undisputed that Alexander and Golden eventually obtained transportation out of the area; that at the same time plaintiffs were attempting to cross the CCC on foot, arrangements were being executed to provide them safe passage from the city; and that although Alexander was not allowed to proceed across the CCC on foot, buses were dispatched from the west bank to the east bank to pick up Alexander and her group, and then transport them over the CC to the west bank. The evidence supports that had foot traffic been allowed on the CCC, the pedestrians would have been in the middle of heavy vehicular traffic, including law enforcement, speeding emergency vehicles, and vehicles with other evacuees. Further, the evidence demonstrates that in denying plaintiffs passage across the CCC on foot, law enforcement was attempting to preserve order and safety in the state of emergency created by Hurricane Katrina.[36] Although plaintiffs were not allowed to cross the CCC how and when they wanted, it is undisputed that plaintiffs eventually were able to leave the area.

While plaintiffs allege that their fundamental right to interstate travel was violated, the evidence supports that law enforcement had compelling reasons to refuse plaintiffs' passage across the CCC on foot. Plaintiffs cannot show that they were intentionally or recklessly deprived of their right to interstate travel, even temporarily, under color of state law.[37] The court concludes that as

---

[36]*Zemel,* 381 U.S. at 15-16. The evidence further shows that at the same time plaintiffs were attempting to cross the CCC, arrangements were being executed to provide safe passage from the city. It is undisputed that although Alexander was not allowed to proceed across the CCC on foot, buses were dispatched from the west bank to the east bank to pick up Alexander and her group, and then to transport them over the CCC to the west bank.

[37]*Doe,* 15 F.3d at 450.

a matter of law, plaintiffs' substantive due process rights were not violated with respect to their right to interstate travel.

**3. Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment essentially requires that all persons similarly situated be treated alike.[38] It is violated only by intentional discrimination.[39] An equal protection inquiry is necessary only if the state action "classifies or distinguishes between two or more relevant groups."[40]

Under an equal protection analysis, a court applies different standards of review, and such review is predicated on the right or classification in question. If a government action disadvantages a "suspect class" or impinges a fundamental right, a strict scrutiny standard applies to the government action.[41] By contrast, if the government action does not involve a suspect class or a fundamental right, a rational basis standard is used, and the government action is presumed to be valid and will be sustained if the state action is rationally related to a legitimate state interest.[42]

Plaintiffs contend that treating pedestrians differently from non-pedestrians affected their right to travel and violated equal protection guarantees when plaintiffs were not allowed to proceed across the bridge on foot. While plaintiffs do not identify a statute which they argue violated their equal protection rights, plaintiffs contend that defendants' actions "presumably pursuant to state

---

[38]*Stefanoff v. Hay Co., Tex.*, 154 F.3d 523, 525-26 (5th Cir. 1998).

[39]*Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996).

[40]*Qutb v. Strauss*, 11 F.3d 488, 492 *(5th Cir. 1993), *cert. denied*, 511 U.S. 1127 (1994).

[41]*Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007)(*citing Plyer v. Doe*, 457 U.S. 202, 217-18 (1982)).

[42]*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). *See also Vera,* 73 F.3d at 610 (*quoting Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988)); *Stefanoff*, 154 F.3d at 525.

statute" violated their equal protection rights.

Plaintiffs allege that their fundamental right to travel was violated by defendant's actions. A strict scrutiny standard applies if defendant's actions impinge a fundamental right.

Chief Lawson testified that foot traffic was prohibited on the bridge because of the safety hazard that it created, and because the City of Gretna had no food, water or supplies to furnish to people who might come into Gretna. The court concludes that there is a plausible policy reason for the classification between pedestrian traffic and non-pedestrian traffic. Further, there is no evidence to dispute Lawson's assertions that he believed safety reasons prompted the decision to prohibit foot traffic on the CCC. These safety reasons were further heightened at the time plaintiffs were attempting to cross on foot due to the heavy vehicular traffic on the vehicles-only bridge and the overall state of emergency during which the City of Gretna did not have accommodations for potential evacuees.

The court concludes that the classification of pedestrian traffic and non-pedestrian traffic serves compelling safety and welfare reasons such that plaintiffs' equal protection guarantees have not been violated with respect to their right to interstate travel.[43] The court further concludes that the classification of pedestrian and non-pedestrian traffic is narrowly tailored to serve a legitimate government reason to maintain safety on the CCC. The court concludes that no question of material fact precludes summary judgment and that as a matter of law, the policy prohibiting pedestrians on the CCC was not applied by defendants discriminatorily to prevent plaintiffs' right to travel,

---

[43] *Vera,* 73 F.3d at 610 (affirming summary judgment for law enforcement when plaintiff did not allege membership in identifiable group for equal protection purposes).

interstate or intrastate, in violation of their equal protection guarantees.[44]

## CONCLUSION

The gravamen of the complaint is the denial of the right to cross the CCC on foot during an emergency created by Hurricane Katrina. There is no doubt that the days following Hurricane Katrina were horrific, and that the safety and health concerns were heightened in its aftermath. Plaintiffs have not demonstrated a question of material fact that defendants' actions on those incredibly difficult days violated plaintiffs' substantive due process or equal protection guarantees implicating their constitutional right to travel. The court finds that plaintiffs' right to travel was not violated by defendants' actions.

The motion for partial summary judgment is **GRANTED**, and plaintiffs' right to travel claims are **DISMISSED.**

New Orleans, Louisiana, this ___3rd___ day of December, 2008.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**

---

[44]*See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993).