UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NINA ALEXANDER ET AL.                          CIVIL ACTION

VERSUS                                          NO: 06-5405

CITY OF GRETNA ET AL.                           SECTION: "S" (5)

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the motion to certify Subclass A, represented by Nina Alexander, as a class action is **GRANTED**. **IT IS FURTHER ORDERED** that the motions to certify Subclass B and Subclass C, represented by Cathey Golden, as a class action are **DENIED**. (Documents #13, #40, #87.)

## I. BACKGROUND

In the days immediately following Hurricane Katrina, Nina Alexander, Jocelyn Askew, Quinton Askew, Frances B. Bowie, Signora Durette, and Patryce Jenkins (plaintiffs) attempted to flee New Orleans by crossing the Crescent City Connection on foot. Officers of the Gretna Police Department and deputies from the Jefferson Parish Sheriff's office did not permit them to cross.

The plaintiffs filed a complaint, pursuant to 42 U.S.C. § 1983 against the City of Gretna Police Department through the City of Gretna; Arthur Lawson, Chief of Gretna Police

Department; unknown officers of the Gretna Police Department; Jefferson Parish Sheriff's Office; Jefferson Parish Sheriff Newell Normand;[1] and unknown officers of the Jefferson Parish Sheriff's Office.

The plaintiffs allege that the law enforcement officers threatened them with the use of physical force, physically assaulted them and committed acts of battery, fired loaded weapons, used excessive force while confining them or placing them under arrest, pressed loaded firearms against their bodies, held them in headlocks or chokeholds, and threw them to the ground to prevent them from crossing the brid`ge and entering the City of Gretna. The plaintiffs contend that Chief Lawson and Sheriff Normand ordered their officers to act in this manner. They allege that the conduct violated their First Amendment right of peaceful assembly, Fifth and Fourteenth Amendment Rights of due process, Fourteenth Amendment right of equal protection, Fourth Amendment right against unreasonable search and seizure, Eighth Amendment right against cruel and unusual punishment, the right to travel freely under Article IV, Section 2, and the right of interstate travel under Article I, Section 8.[2] The plaintiffs contend that Chief Lawson and Sheriff Normand are liable under state law for the damages occasioned by the deputies.

The plaintiffs seek to pursue their claims as a class action, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(c)(5). The plaintiffs filed a motion to certify the class,

---

[1] Sheriff Normand was named as a party upon the death of Sheriff Harry Lee.

[2] On December 3, 2008, the court granted the motion for partial summary judgment of the City of Gretna, Gretna Police Department, and Chief Lawson, dismissing the substantive due process claims of violation of the right of intrastate travel and interstate travel and the equal protection claims.

2

proposing that the class be divided into subclasses.

The court held a class certification hearing and granted the parties an opportunity to submit supplemental memoranda. On June 25, 2009, the court ordered the plaintiffs to file an amended motion for class certification, identifying the amended class definition, excluding claims that have been dismissed; amending subclasses, excluding subclasses on claims that have been dismissed; and naming the class representative for each subclass.

The plaintiffs amended the proposed class definition as follows:

> All persons who sustained direct and/or consequential injury and/or losses and/or compensable or cognizable damages by being assaulted, battered, placed in situations of serious danger, exposed to risks of serious harm, unlawfully detained through the use of excessive force as a result of the closure of the Crescent City Connection to pedestrian traffic beginning on or about August 30, 2005 through September 2, 2005 on the Crescent City Connection in the Parish of Orleans, State of Louisiana, and in the immediate vicinity of the Crescent City Connection in the Parish of Jefferson, State of Louisiana, by the City of Gretna, City of Gretna law enforcement officials, and Jefferson Parish law enforcement officials while attempting to evacuate from New Orleans in the aftermath of Hurricane Katrina.

This class definition subsumes the following sub-classes:

> **SUBCLASS A**: An opt-out personal injury class of individuals who were employed by the Regional Transit Authority (RTA), their family members, friends who were assaulted, battered, and unlawfully detained through the use of excessive force as a result of the closure of the Crescent City Connection to pedestrian traffic, on August 30, 2005, in an area surrounding the bus terminal beneath the Westbank Expressway in the Parish of Jefferson.

> **SUBCLASS B:** An opt-out personal injury class of individuals who were assaulted, battered, unlawfully detained through the use of excessive force, as a result of the closure of the Crescent City Connection to pedestrian traffic, on September 1, 2005 in and around the area of the Tchoupitoulas access ramps leading to the Crescent City Connection in the Parish of Orleans.

> **SUBCLASS C:** An opt-out personal injury class of individuals who were assaulted, battered, unlawfully detained through the use of excessive force, as a result of the closure of the Crescent City Connection to pedestrian traffic on or about September 2, 2005 in and around the area of the Pontchartrain Expressway near and/or over St. Charles Avenue and the area of the Tchoupitoulas access ramps leading to the Crescent City Connection in the Parish of Orleans.

**Subclass A**

Subclass A is represented by Nina Alexander. Alexander testified in her deposition that she stayed at the administrative building for the Regional Transit Authority on Canal Street during the storm. See Document #73. The RTA converted the building to a shelter for its employees and their families. Kevin Roy, Alexander's boyfriend, worked as a supervisor for the RTA. Approximately 200 people were at the shelter when Hurricane Katrina arrived. When Alexander woke up on the Tuesday after the storm struck, the streets were flooded, and the RTA occupants were running out of food and water.

The supervisors organized approximately ten groups of people to try to make their way to the west bank of the Mississippi River where there would be buses to take them to safety. Alexander's group of approximately 20 people walked down Canal Street to Claiborne Avenue in at least five feet of water. Near the intersection of Tulane Avenue and Claiborne Avenue, the group walked up the ramp to the expressway, walking against traffic toward the west bank of the Mississippi River.

When members of the group arrived at the Crescent City Connection, they encountered other groups which had been stopped by armed police officers, who told them they could not cross the bridge on foot. Two Crescent City Connection police cars were parked facing each

4

other to block access, and another car blocked the ramp. One of the supervisors called the office of Governor Kathleen Blanco, and negotiations began to allow buses to come to pick up the RTA groups.

After approximately one hour, three busses arrived to pick them up and drove them to a bus terminal in Gretna underneath the expressway. While they were under the expressway, Gretna police officers arrived, cocked their weapons, and asked what they were doing there. The police officers told them not to move, but left the area when they received an emergency call that an officer had been shot at the Chevron gas station. After approximately one hour and a half, charter buses arrived to take them to the RTA terminal on General DeGaulle where they would await the arrival of buses from Baton Rouge to transport them out of the New Orleans area.

**Subclass B**

Cathey Golden is the class representative of subclass B for claims that arose on Thursday, September 1, 2005. Golden testified in her deposition (document #70) that she, her daughter, her son, and three friends of her children (the Goldens) came to New Orleans from Boston on the Friday before Hurricane Katrina to visit family and friends and stayed at the Monteleone Hotel. Realizing that there was going to be a major storm, Golden called the airport in an attempt to leave the City. The airport was closed; therefore, Golden purchased supplies and returned to the hotel to await the storm.

On the Thursday following the Hurricane, the management of the hotel asked everyone to leave because the hotel had run out of food. The hotel suggested that the guests go to the Convention Center. The Goldens passed the Convention Center, but decided to try to cross the

bridge in the hopes that there would be buses to take them out of New Orleans. As they walked up the down ramp at Tchoupitoulas Street, they encountered hundreds of people. When Golden got near the top of the ramp, she heard one shotgun blast. She did not see the type of gun or the person who fired because there were people in front of her.

Golden walked to the front of the crowd to see what was going on. Golden encountered three or four police officers, two of whom were speaking to the crowd about safety issues. Golden identified Lawrence Vaughn as the officer who had the shotgun. A young African American man with a baby was arguing with Vaughn about crossing the river to join family members. As Golden returned to where her children and their friends were, she heard another gunshot. Golden does not know if both shots came from the same gun or the same area because she was walking back to where her children were and her back was turned.

The Goldens walked on the Pontchartrain Expressway in the opposite direction from the bridge for approximately five or ten minutes. They stopped for a couple of hours until an officer jumped out of a car pointing a shotgun in their general direction and told them to "get the f'ing off" of the expressway. The Goldens went down the ramp and took shelter Thursday night in a bus that was abandoned in a nearby church yard.

**Subclass C**

Golden is also the representative for subclass C for claims that occurred on Friday, September 2, 2005. See document #70 at 52. On Friday, the Goldens met two paramedics with cell phone who were able to contact a San Francisco Search and Rescue team. At approximately 8:30 a.m., the Goldens and the paramedics walked toward the bridge. One of the paramedics,

Larry Bradshaw, talked to the ranking officer on the bridge. The officer contacted his commanding officer, who gave permission to the Goldens and the paramedics to cross the bridge on foot.

Before the group crossed the bridge, Golden saw an officer put a gun in the face of a white, middle-aged couple. When the man continued to argue with the officer about crossing the bridge, the officer discharged the weapon into the air.

When the group arrived on the West Bank, they went to a gas station where law enforcement officers and firefighters gathered. The paramedics borrowed cell phones to contact San Francisco Search and Rescue again. Firefighters arrived with minivans and took them to a rendezvous point that Larry had arranged with the San Francisco Search and Rescue. Helicopters arrived and took them to the Saints training camp on Airline Drive. The Goldens were then taken to the airport and were put aboard a military transport plane, which took them to Texas. The Goldens arrived in Boston on Saturday afternoon.

## II. DISCUSSION

### A. Legal standard

To certify a class , the putative class must meet the four requirements set out in Rule 23(a). "A district court must rigorously analyze Rule 23's prerequisites before certifying a class." Spence v. Glock, GES.M.B.H., 227 F.3d 308, 310 (5th Cir. 2000). "The district court has broad discretion to certify a class, which it must exercise within the confines of Rule 23." Id. "The party seeking certification bears the burden of proof." Id.

"Rule 23(a) requires that (1) the class be so numerous that joinder of all members is

impracticable [numerosity], (2) there be questions of law or fact common to the class [commonality], (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class [typicality], and (4) the representative parties fairly and adequately protect the interests of the class [adequacy]." James v. City of Dallas, Tex., 254 F.3d 551, 569 (5th Cir. 2001).

"To satisfy the numerosity prong, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." Id. at 570. "To demonstrate commonality, plaintiffs must allege that there exist questions of law or fact common to the class." Id. "The test for commonality is not demanding." Id. "The interests and claims of the various plaintiffs need not be identical." Id. "In order to meet the typicality requirement, the claims or defenses of the parties [must be] typical of the claims or defenses of the class." Id. at 571.

"Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." Id. "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. "[A] class representative must be a part of the class and possess the same interest and suffer the same injury as class members." In re FEMA Trailer Formaldehyde Products Liability, 2008 WL 5423488 *7 (E.D.La. 2008). If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." James v. City of Dallas, Tex., 254 F.3d at 569. The court must find that the representative parties fairly and adequately protect the interest

8

of the class. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." Id. "The adequacy requirement to class certification is closely tied to the typicality prerequisite." In re FEMA Trailer Formaldehyde Products Liability, 2008 WL 5423488 *11 (E.D.La. 2008). "[I]n the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members." Id. (quoting In re Vioxx, 239 F.R.D. 450, 460 (MDL No. 1657 2006)).

"The court must also find that the class fits within one of the categories of Rule 23(b)." James v. City of Dallas, Tex., 254 F.3d at 569. The plaintiffs seek certification under Rule 23(b)(3), which sets out the requirements of predominance and superiority. Rule 23(b)(3) provides:

> (b) A class action may be maintained if Rule 23(a) is satisfied, and if:
> . . . .
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>     (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>     (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>     (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>     (D) the likely difficulties in managing a class action.

Pursuant to Rule 23(c)(5), "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Each subclass must independently meet the requirements of Rule 23. See In re FEMA Trailer Formaldehyde Products Liability, 2008 WL

9

5423488 at n.3 (E.D.La. 2008). "If each subclass meets Rule 23's requirements, the matter may proceed in a consolidated action even if the matter could not have been certified as a single, all-inclusive class under the rule." Id.

Rule 23(b)(3) provides class members with the absolute right to notice or to opt out of the class if class members wish to pursue their claims for money damages in individual lawsuits. Fed. Rule Civ. Pro. 23(c)(2)(B). "Providing these rights exclusively to (b)(3) classes demonstrates concern for the effect of monetary claims on class cohesiveness." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 413 (5th Cir. 1998).

**B. Numerosity and commonality**

Subclasses A and B meet the numerosity requirement because subclass A involves approximately 200 people, and subclass B involves between 800 and 1,000 people. Subclass C does not meet the numerosity requirement because it involves between eight and twenty people. However, the court may in its discretion certify subclass C, even if does not strictly meet the criteria if the court finds that it will facilitate the management of the case. See American Timber & Trading Co. v. First Nat'l Bank of Oregon, 690 F.2d 781, 786-87 (9th Cir. 1982).

The three subclasses also meet the commonality requirement because the question of an Eighth Amendment violation in the use of excessive force in relation to pedestrians crossing the Crescent City Connection is common to all of the subclasses. The remaining Rule 23(a) questions are whether the claims arise from a similar course of conduct and whether the differences between the named plaintiffs' interests and the subclass members' interest create conflicts that render the named plaintiffs inadequate representatives of the subclass. Rule 23(b)

requirements of predominance and superiority must also be met.

## C. Typicality and adequacy of representation

### 1. Subclass A

The claims of Alexander, the subclass representative, have the same essential characteristics of those she purports to represent. Subclass A is composed of employees of RTA and their families who allege that they were subjected to excessive force when Gretna police officers arrived, brandishing weapons and threatening them not to move or they would be shot, as they waited underneath the expressway in Gretna to be transported to the RTA terminal on General DeGaulle. There are no differences which create a conflict between Alexander's interests and the subclass's interest; therefore, the claims meet the requirements of typicality and adequacy of representation. Although some individual members of the group of RTA employees and family members may not have been affected by the alleged arrival and actions of the Gretna police, questions of law and fact common to the subclass members predominate over any questions that may be raised by individuals, and class action treatment is superior to any other means of addressing the claims. The motion to certify subclass A is granted.

### 2. Subclass B

Golden's claims are not typical of the claims of subclass B. The putative plaintiffs are individuals who allege they were assaulted, battered, and unlawfully detained through the use of excessive force. In her deposition, Golden testified that on September 1, 2005 (subclass B), she heard gunshots when she was walking up the ramp near Tchoupitoulas Street that leads to the Crescent City Connection. She did not see the shots fired and cannot know from the sound alone

where the shots originated.  Moreover, Golden's experience with the officer who jumped out of his car pointing a shotgun and ordering the Goldens off of the expressway is not typical of the experience of the purported members of subclass B who may have heard gunshots near the Tchoupitoulas ramp.  Accordingly, Golden's experience is not similar to those she purports to represent that were "assaulted, battered, and unlawfully detained through the use of excessive force."  Because of the differences between Golden and the putative class members, Golden is an inadequate representative of subclass B.

Moreover, facts common to subclass members do not predominate.  Between 800 and 1,000 people lined the ramp, and many had a different experiences as a result of the sound of gunshots, depending on each position on the ramp and proximity to any gunshots. Certification is not appropriate because the claims focus on facts and issues specific to individuals, rather than the class as a whole.  The motion to certify subclass B is denied.

### 3. Subclass C

Similarly, Golden claims are not typical of putative plaintiffs in subclass C.  Golden, her children, and their friends met paramedics that were in communication with a search and rescue team from San Francisco.  The group of eight walked to the bridge and were allowed to cross to the west bank, where they were taken to safety.  Golden did not suffer the same experience as the people that encountered an officer who brandished his weapon and shot into the air, which she purports to represent.  Accordingly, her experience is not typical of the subclass, and she is not an adequate representative.  In addition, as discussed above, subclass C does not satisfy the numerosity requirement.  Because Golden does not meet the typicality and adequacy prongs of

the analysis for subclass C, it is not necessary to determine whether a subclass of so few people should be certified. The motion to certify subclass C is denied.

### III. CONCLUSION

The motion to certify subclass A, represented by Nina Alexander, as a class action is granted. The requirements of Rule 23(a) of numerosity, commonality, typicality, and adequacy of representation are met. Further, Rule 23(b)(3) is satisfied because common questions of law and fact predominate, and class action is the superior means of adjudicating the controversy.

The motion to certify subclass B, represented by Cathey Golden, as a class action is denied. The Rule 23(a) requirements of numerosity and commonality of the excessive force issue are present; however, because the plaintiffs have not shown that her claims regarding the use of excessive force while walking up the Tchoupitoulas Street ramp are typical of subclass B, Golden does not provide adequate representation of subclass B.

The motion to certify subclass C, represented by Cathey Golden, as a class action is denied. The subclass does not meet the numerosity requirement of Rule 23(a). Moreover, the claims of excessive use of force when an officer brandished a weapon while removing her group from the expressway, and another officer brandished a weapon and shot into the air while addressing another group of people are not typical and do not provide adequate representation for subclass C.

New Orleans, Louisiana, this __28th__ day of September, 2009.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**